UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| REGINALD MARTIN AGENCY, INC., et al.,   ) | |
| ) | |
| Plaintiffs,   ) | |
| ) | |
| vs.   ) | 1:04-cv-1587-TAB-RLY |
| ) | |
| CONSECO MEDICAL INSURANCE   ) | |
| COMPANY, et al.,   ) | |
| ) | |
| Defendants.   ) | |

**ENTRY ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**[1]

**I.      Introduction.**

Effective April 15, 2002, Defendant Conseco Medical Insurance Company ("CMIC")[2]

terminated its relationship with several insurance agents/brokers as a result of its decision to

withdraw from the major medical insurance market in various states.  The insurance

agents/brokers (collectively "the Plaintiffs") filed suit alleging a variety of claims, including

breach of contract, breach of fiduciary duty, and tortious interference with a prospective business

advantage.[3]  CMIC seeks summary judgment on these claims arguing, among other things, that it

had a contractual right to terminate its relationship with the Plaintiffs.  In addition, CMIC

---

[1]The Defendants originally filed their motion as a motion to dismiss or, in the alternative, a motion for summary judgment.  [Docket No. 45].  As noted in its June 22, 2005 order, the Court treats the Defendants' motion as a motion for summary judgment.  [Docket No. 57].

[2]CMIC merged with co-Defendant Washington National Insurance Company.  For ease of reference, the Court collectively refers to the Defendants as CMIC.

[3]Plaintiffs also brought claims for fraud and deceit, constructive fraud, fraudulent concealment, fraudulent inducement, and promissory estoppel.  CMIC does not seek summary judgment on these claims.

contends that it did not owe a fiduciary duty to the Plaintiffs because no special relationship existed between the parties.  As explained more fully below, the Court agrees that CMIC did not breach its contract -- or contracts, as the case may be -- with the Plaintiffs.  Accordingly, CMIC is entitled to summary judgment on the Plaintiffs' breach of contract claim.  However, questions of material fact remain regarding the Plaintiffs' claim for breach of fiduciary duty and tortious interference with a prospective business advantage.  CMIC's motion for summary judgment is denied on those claims.

## II.    Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Illinois Cent. R. Co. v. South Tec Development Warehouse, Inc., 337 F.3d 813, 816 (7th Cir. 2003).  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.'"  Fritcher v. Health Care Service Corp., 301 F.3d 811, 815 (7th Cir. 2002), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court construes all facts and draws all reasonable inferences in the light most favorable to the non-moving party. Butera v. Cottey, 285 F.3d 601, 605 (7th Cir. 2002).  Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Michael v. St. Joseph County, 259 F.3d 842, 845 (7th Cir. 2001).

### III.    Background.[4]

The Plaintiffs were high-volume health insurance agents/brokers doing business across various states in the South and in the Midwest from Ohio to Montana.  [2nd Amend. Compl. ("Compl."), ¶¶ 1-10, 20].[5]  By 1997, each Plaintiff had entered into a Field Marketing Organization ("FMO") agreement with Connecticut National Life Insurance Company ("Connecticut National").  [Compl., ¶ 21].  The FMO was a non-exclusive business relationship that permitted the Plaintiffs to offer other lines of similar coverage.  [Compl., ¶ 21].

CMIC sold individual major medical health insurance policies throughout the United States through insurance agents like Plaintiffs.  [Compl., ¶11].  In 1997, CMIC purchased Connecticut National.  [Compl., ¶ 22].  After the acquisition, CMIC, in conjunction with a related and affiliated company, Conseco Marketing, LLC, developed a new, exclusive FMO agreement that replaced the previous FMO agreements between Plaintiffs and Connecticut National.  [Compl., ¶ 22; Docket No. 60, Ex. C, p. 2].  The agreements were mandatory for those who wished to continue to do business with CMIC.  By 1999, each of the Plaintiffs had entered a Sales Representative Agreement ("the 1999 agreement") with Conseco Marketing, authorizing the Plaintiffs to sell CMIC's policies.  [Compl., ¶¶ 22-23; Docket No. 54, Ex. A; Docket No. 59, pp. 12-14].

In 2000, news spread regarding the financial distress of CMIC's parent, Conseco, Inc.,

---

[4]The facts are either undisputed or viewed in a light most favorable to the Plaintiffs, the non-moving parties.  In addition, this background section is a brief overview of the facts, not an exhaustive recitation of all material facts.

[5]For purposes of the instant motion only, Defendants concede that the factual allegations in  paragraphs 1-18 and 20-84 of Plaintiffs' second amended complaint are true and accurate. [Docket No. 46, p. 4 n.2].

and as a result, the Plaintiffs began to inquire into the viability of CMIC's business, its financial stability and its present commitment to continue offering individual major medical insurance. [Compl., ¶ 29]. CMIC provided information to the Plaintiffs during the year 2000 concerning its viability, financial stability, and unwavering commitment to the major medical insurance business. This information was critical to the Plaintiffs as they negotiated, weighed their options and considered whether to contract with CMIC for the year 2001 or to seek other insurance carriers with which to do business so as to best maintain their client relationships. [Compl., ¶ 30]. From 2000 through 2002, CMIC, through its agents, employees, officers and related affiliated Conseco companies, represented that it was financially stable and profitable, and that CMIC was firmly committed to staying in the major medical insurance business. [Compl., ¶¶ 32-48].

In 2001, each of the Plaintiffs entered several agreements with CMIC. [Compl., ¶¶ 49-52; Compl., Ex. K]. These agreements included Field Marketing Organization Marketing Partnership Guidelines, 2001 Field Marketing Organization Minimum Production Requirements, 2001 Field Marketing Organization Bonus agreement, and 2001 Field Marketing Organization Bonus Advance Agreement ("the 2001 agreements"). [Compl., Ex. K]. CMIC presented the 2001 agreements to the Plaintiffs with a cover letter that described the 2001 agreements as "new Conseco Sales Representative Addendums for your agency." [Compl., Ex. J]. CMIC drafted the 2001 agreements and did not invite or permit negotiation regarding the terms of the 2001 agreements. [Martin Aff., ¶ 6; Noell Aff., ¶ 6; Smith Aff., ¶ 6; Jasnoski Aff., ¶ 6; Froug Aff., ¶ 6; Reichley Aff., ¶ 6; Kanatzar Aff., ¶ 6; Sepulveda Aff., ¶ 6; Vandersnick Aff., ¶ 6; Schwenkner Aff., ¶ 6].

4

In August 2001, CMIC exited the major medical insurance market in the following states: Arizona, Arkansas, Delaware, Georgia, Hawaii, Illinois, Indiana, Kansas, Missouri, Montana, Oklahoma, South Dakota, Tennessee, Utah, and Wyoming.  [Compl., ¶ 58].  According to the 1999 agreement, Conseco Marketing "reserve[d] the right at any time to withdraw from any territory, and to discontinue or withdraw or amend any Policies used in a territory without prejudice to its right to operate in any other territory."  [Docket No. 54, Ex. A, p. 6].  The 2001 agreements with CMIC contain no such language.  [Compl., Ex. K].  Thereafter, on March 8, 2002, CMIC terminated the Plaintiffs' "Field Office Agreements/Sales Representative Agreements" effective April 15, 2002.  [Compl., ¶ 60; Docket No. 45, Ex. 1].

## IV.    Discussion.

### A.    Breach of Contract.

The parties agree that Indiana law governs this dispute.[6]  In Indiana, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages."  Berkel & Co. Contractors, Inc. v. Palm & Associates, Inc., 814 N.E.2d 649, 655 (Ind. Ct. App. 2004).  Here, the dispute is not so much whether a contract exists, but what contract governs the relationship between the parties.  "Construction of written contracts is generally a question of law for which summary judgment is particularly appropriate."  Forty-One Associates, LLC v. Bluefield Associates, L.P., 809 N.E.2d 422, 427 (Ind. Ct. App. 2004).

_____

[6]This action was transferred to this Court from the Northern District of Georgia, in large part, due to the "Governing Law and Jurisdiction" clause found in the 1999 agreement.  [See Docket No. 60, Ex. B, pp. 6-7].  As explained below, Plaintiffs now contend that the 1999 agreement is of no matter, and the 2001 agreements are controlling.  However, the 2001 agreements do not contain a choice of law/forum clause.  Nonetheless, the parties' briefs correctly center on Indiana law.

Moreover, when the terms of a contract are clear and unambiguous, they are conclusive and the Court will not consider extrinsic evidence. Id. "When interpreting a contract, a court must ascertain and effectuate the intent of the parties." Stelko Elec., Inc. v. Taylor Community Schools Building Corp., 826 N.E.2d 152, 156 (Ind. Ct. App. 2005).

As noted above, two agreements are at issue: the 1999 agreement between the Plaintiffs and Conseco Marketing; and the 2001 agreements between the Plaintiffs and CMIC. According to the Plaintiffs, the 1999 agreement has nothing to do with the current dispute because Conseco Marketing and CMIC are separate and independent legal entities. Moreover, the Plaintiffs argue that the 2001 agreements make no reference to Conseco Marketing or otherwise incorporate the 1999 agreement in any way. Finally, the Plaintiffs contend that CMIC improperly relies on allegations from the Plaintiffs' first amended complaint. According to the Plaintiffs, "[t]he allegations in the Second Amended Complaint supporting Plaintiffs' breach of contract claim are solely based on a contract between Plaintiffs and CMIC." [Docket No. 52, p. 26].

In large part, the Plaintiffs are correct. CMIC does not dispute that Conseco Marketing and CMIC are separate and distinct legal entities. [See Compl., Exs. B, C, D]. In addition, the 2001 agreements do not mention Conseco Marketing or the 1999 agreement. The Plaintiffs are also correct that the second amended complaint supercedes all previous complaints and "[a] court cannot resuscitate . . . facts [from a prior complaint] when assessing whether the amended complaint states a viable claim." Kelly v. Crosfield Catalysts, 135 F.3d 1202, 1205 (7th Cir. 1998).[7] Nonetheless, for the reasons set forth below, the Court finds that the 1999 agreement

_____

[7]In ruling on the instant motion, the Court does not consider alleged facts from the Plaintiffs' earlier complaints. Nonetheless, it is easy to understand CMIC's confusion. In both the original complaint and the first amended complaint, the Plaintiffs alleged that the 1999

controls and the Plaintiffs' breach of contract claim must be dismissed.

At the outset, the Plaintiffs argue that CMIC's motion to dismiss with respect to the breach of contract claim fails because CMIC "relies solely on a contract between Conseco Marketing, LLC and Plaintiffs to which CMIC was not a party. Instead, the contracts at issue and those which CMIC breached are between CMIC and Plaintiffs only." [Docket No. 52, p. 26]. The Plaintiffs are correct that the 1999 agreements were entered by Conseco Marketing and the Plaintiffs. Yet, it cannot be said that the 1999 agreement does not contemplate and govern certain aspects of the relationship between CMIC and the Plaintiffs. As CMIC points out, the 1999 agreement identifies CMIC as an affiliated company of Conseco Marketing, and grants the Plaintiffs the right to sell CMIC's policies.[8] Specifically, the 1999 agreement states as follows:

## I.     CONCEPT

This Agreement is made by and between Conseco Marketing, L.L.C., an Indiana limited liability company, called "we", "us" or the "Company" and _____, called "you" or "Representative". The Company is affiliated with a number of insurance companies, called the "Conseco Companies", that offer life insurance, health insurance and the annuity policies or certificates, called "Policies", to customers through independent producers. The Company and Representative desire to enter into this Agreement and work together for their mutual benefit, through the sale and service of Conseco Companies' Policies to suitable customers who desire to purchase such Policies.

## II.     AGREEMENT DATE

The Agreement Date applies to all Policies issued on or after the Agreement Date, which is specified on the signature page of this Agreement.

[Docket No. 54, Ex. A, p. 3]. Additionally, the 1999 agreement provides that "[t]his Agreement

_____

contracts governed the relationship between the parties and that CMIC, as well as Conseco Marketing, had breached that agreement. In the end, the Plaintiffs' change in theory, while creative, does erase the existence of the 1999 agreement.

[8]Notably, the Plaintiffs do not address this argument.

applies specifically to Policies issued by the Conseco Companies, which are listed on the Compensation Schedules attached to and made a part of this Agreement." [Docket No. 54, Ex. A, p. 3]. CMIC is specifically identified in the Compensation Schedule attached to the 1999 agreement. Thus, the 1999 agreement between the Plaintiffs and Conseco Marketing authorized the Plaintiffs to sell CMIC's policies and expressly governs the relationship between the Plaintiffs and CMIC relating to sale of those policies.

The Plaintiffs argue that their breach of contract claim must be decided by the trier of fact because, "Defendants admit they seek summary judgment on Plaintiffs' contract claim based upon extrinsic evidence outside the four corners of the contracts, including the use of the term 'Addendums,' in a transmittal letter, the payment of commissions and 'the facts surrounding the Defendants' business relationship with Plaintiffs.'" [Docket No. 59, p. 10]. The Plaintiffs are correct that "[i]f the contract is ambiguous or uncertain in its terms, and if the meaning of the contract is to be determined by extrinsic evidence, its construction is a matter for the trier of fact." Kelly v. Hamilton, 816 N.E.2d 1188, 1194 (Ind. Ct. App. 2004). However, as explained above, the 1999 agreement unambiguously applies to the relationship between CMIC and the Plaintiffs as it relates to the sale of CMIC's insurance policies. Accordingly, the Court need not consider extrinsic evidence in this matter.[9]

---

[9]The Court notes, however, that CMIC's proposed extrinsic evidence supports only one plausible conclusion: the 1999 agreement governs the relationship between CMIC and the Plaintiffs as it relates to the sale of CMIC's insurance policies. For example, as CMIC points out:

In 1999, when Plaintiffs entered into their Sales Representative Agreements, they were forwarded letters that specifically enclosed the FMO Marketing Partnership Guidelines and clearly stated that the FMO Marketing Partnership Guidelines were "Addendums" to their Sales Representative Agreements. This was reiterated in letters sent to the Plaintiffs

Having determined that the 1999 agreement applies to the relationship between the parties, the Court turns to the issue of breach.  The Plaintiffs allege that CMIC breached the 2001 agreements by failing "to act with honesty and integrity in their dealings with Plaintiffs," [Compl., ¶ 86], and by terminating the 2001 agreements.  [Compl., ¶ 91].  Specifically, the Plaintiffs argue that "CMIC's motion should be denied because CMIC had no contractual right to exit and the 'honesty and integrity' provision unequivocally covers CMIC's conduct." [Docket No. 52, p. 26].  For the reasons stated below, the Court disagrees.

With respect to CMIC's decision to withdraw from the major medical insurance market, the Plaintiffs argue that "even if the contract with Conseco Marketing, LLC should be considered, it still does not expressly give <u>CMIC</u> the authority to breach its contract with Plaintiffs, the right to abandon any market at its whim, or to terminate the contract prematurely." [Docket No. 52, p. 27].  The applicable language in the 1999 agreement states as follows:

**V.    TERRITORY AND ASSIGNMENT**

1.    You may solicit and market in any territory in which the applicable Conseco Company is authorized to do business and in which you are licenced and appointed with the applicable Conseco Company, unless you are advised by us in writing to cease marketing a particular Policy or Policies or to cease doing business in a particular territory.

2.    Your appointment is not exclusive in such territory and we may appoint other representatives in the territories at our discretion.

---

in 2000 and 2001, where the FMO Marketing Partnership Guidelines are specifically referenced as "Conseco Sales Representative Addendums."

[Docket No. 60, pp. 5-6] (citations omitted).  Despite the Plaintiffs' arguments to the contrary, the Court finds that it is unreasonable to conclude that the parties intended for the 2001 agreements to be anything other than subordinate addendums to the 1999 agreement at the time they were entered.

> 3.      The Company reserves the right at any time to withdraw from any territory, and to discontinue or withdraw or amend any Policies used in a territory without prejudice to its right to operate in any other territory.

[Docket No. 54, Ex. A, p. 6].  Interpreting this language, the Plaintiffs contend that only "the Company," i.e. Conseco Marketing, has the right to withdraw from any territory at any time. [See Docket No. 52, p. 28].  However, such an interpretation defies common sense.  See Beanstalk Group, Inc. v. AM Gen. Corp., 283 F.3d 856, 860, 862 (7th Cir. 2002) (explaining the role of common sense in interpreting contracts, as well as the need to read contract as a whole) (Indiana law); Northstar Partners v. Marsh Supermarkets, LLC, 2004 WL 1784903, at *4 (S.D. Ind. 2004) ("Even if the terms of the contract could somehow be viewed as unclear, courts can and should use common sense when construing contracts."); F.E. Gates Co., Div. of Blakley Corp. v. Hydro-Technologies, Inc., 722 N.E.2d 898, 903 n.4 (Ind. Ct. App. 2000) ("The construction that is to be adopted in construing a contract is one which appears to be in accord with justice and common sense . . . .").

As explained above, the 1999 agreement granted the Plaintiffs the right to sell CMIC's policies as an affiliated company of Conseco Marketing.  It is true that the 1999 agreement defines "the Company" as Conseco Marketing, and only the Company reserved the right to withdraw from any territory at any time.  Nonetheless, the 1999 agreement specifically states that the Company can "discontinue or withdraw or amend any Policies used in a territory." [Docket No. 54, Ex. A, p. 6].  Those "policies" are issued by affiliated Conseco Companies -- in this instance, CMIC.  Thus, common sense dictates that CMIC could withdraw, discontinue, or amend it policies at any time without breaching the 1999 agreement.  In other words, while the 2001 agreements might have governed other aspects of the parties' relationship, the 1999

10

agreement governed how and when CMIC could discontinue their policies.  It is undisputed that CMIC gave the Plaintiffs thirty days written notice pursuant to the termination clause of the 1999 agreement.  Accordingly, CMIC did not breach the 1999 agreement or the 2001 agreements by terminating them.

The Plaintiffs' claim that CMIC breached its contractual duty to act with honesty and integrity also fails when viewed in context and with an eye toward common sense.  According to CMIC, "Plaintiffs seek to bind Defendants to one small phrase which is quoted out of context in the Second Amended Complaint."  [Docket No. 46, p. 11, citing Compl., ¶ 86].  The Court agrees.  The complete text in the 2001 agreements from which the Plaintiffs extract CMIC's alleged honesty and integrity duty states as follows:

### D.    CONSECO'S CORPORATE CODE OF CONDUCT

Consistent with Conseco's mission and core principles and to help maintain compliance with all laws and regulations, we have adopted a code of ethical standards for our sales representatives and employees in connection with the sale and servicing of our insurance products.  Our sales representatives and employees are committed to the following guidelines:

**Honesty and integrity.**  We will conduct business according to high standards of honesty and integrity, maintaining a system of supervision and review designed to assure a desired level of performance.

[Compl., Ex. K, p. 2] (underlined emphasis added).  Despite the Plaintiffs' arguments to the contrary, the Court finds that this language clearly and unambiguously refers to the "sale and servicing" of CMIC's insurance products.  In other words, the 2001 agreements provide instruction on how CMIC's employees and sales representatives deal with customers that desire to purchase insurance.  While CMIC may be duty bound to deal with the Plaintiffs with honesty and integrity, that duty is not a contractual obligation defined in the 2001 agreements.

Accordingly, CMIC's motion for summary judgment with respect to the Plaintiffs' breach of contract claim is granted.

### B.    Breach of Fiduciary Duty.

CMIC argues that the Plaintiffs' breach of fiduciary duty claim must also fail because no special relationship existed between the parties to create a fiduciary duty.  "Generally, equity will act to protect a relationship of trust and confidence between parties and to prevent the party owing the duty from profiting by its breach."  Coca-Cola Co. v. Babyback's International, Inc., 806 N.E.2d 37, 46 (Ind. Ct. App. 2004).  "In Indiana, various legal and domestic relationships raise a presumption of confidence and trust as to the subordinate party on the one hand and a corresponding influence as to the dominant party on the other.  These relationships include, among others, principal and agent."  In re Estate of Wade, 768 N.E.2d 957, 961 (Ind. Ct. App. 2002) (internal citations omitted).  In addition, Indiana courts have explained:

> Although the existence of a confidential relationship depends upon the facts of each case, it can generally stated that a confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other.  Not only must there be confidence by one party in the other, the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge.  Furthermore, it must be shown that the dominant party wrongfully abused the confidence by improperly influencing the weaker so as to obtain an unconscionable advantage.

Coca-Cola Co., 806 N.E.2d at 46, quoting Kreighbaum v. First Nat'l Bank & Trust, 776 N.E.2d 413, 419 (Ind. Ct. App. 2002).  Whether a confidential relationship exists is a question of fact. Id.  Likewise, "[t]he question of whether an agency relationship exists and of the agent's authority is generally a question of fact."  Heritage Development of Indiana, Inc. v. Opportunity Options, Inc., 773 N.E.2d 881, 888 (Ind. Ct. App. 2002).

The Plaintiffs argue that CMIC owed them a fiduciary duty because a principal-agent

12

relationship existed between the parties.  In addition, the Plaintiffs contend that a fiduciary duty attaches because CMIC created a relationship of confidence and trust by sharing confidential information with the Plaintiffs.  In response, CMIC maintains that the Plaintiffs were merely independent contractors and not agents.  Also, CMIC claims that the relationship of the parties was based on arm's-length contractual negotiations.  Accordingly, CMIC concludes that it did not owe the Plaintiffs any fiduciary responsibilities.  For the reasons that follow, the Court disagrees with CMIC.  Accordingly, CMIC's motion for summary judgment is denied on the Plaintiffs' breach of fiduciary duty claim.

CMIC expends a great deal of energy describing the amount of control that CMIC exerted over the operations of the Plaintiffs to illustrate that the Plaintiffs were, in fact, independent contractors.  [See Docket No. 46, pp. 13-14; Docket No. 54, pp. 15-17].  However, as the Plaintiffs correctly point out, whether they are independent contractors does not, necessarily, mean that they are not agents as well.  As noted by the Indiana Supreme Court:

> While servants and independent contractors are different in a tort context, this is not necessarily true in an agency context.  In the agency context, both a servant and an independent contractor can be an agent of the principal.  In other words, while an independent contractor cannot be a servant, and vice versa, they can both be agents.

Sword v. NKC Hospitals, Inc., 714 N.E.2d 142, 148 n.5 (Ind. 1999) (internal citations omitted). See also Restatement (Second) of Agency § 2(3) ("An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.") (emphasis added).  Moreover, the Plaintiffs do not dispute that they were independent contractors.  [See Docket No. 52, p. 18] ("the facts as pled establish that Plaintiffs are both independent contractors and CMIC's agents.").

Accordingly, CMIC's argument that Plaintiffs are independent contractors is not particularly germane to the issue at hand: whether a principal-agent relationship existed.

"To establish an agency relationship three elements must be shown: (1) a manifestation of consent by the principal to the agent, (2) an acceptance of the authority by the agent, and (3) control exerted by the principal over the agent." Johnson v. Blankenship, 679 N.E.2d 505, 507 (Ind. Ct. App. 1997). In a light most favorable to the Plaintiffs, the facts reveal that the Plaintiffs entered a contract with Conseco Marketing that authorized the Plaintiffs to sell CMIC's policies. [Compl., ¶¶ 22-23; Docket No. 54, Ex. A]. Pursuant to the agreement, Plaintiffs were required to "actively promote, advertise and recruit sales representatives on behalf of CMIC" using established company guidelines. [Compl., Ex. K, p. 1]. In addition, CMIC required the Plaintiffs to exclusively sell CMIC's products. CMIC prohibited the Plaintiffs from "actively recruit[ing] producers or promot[ing] new business sales activity with other individual major medical health insurance carriers offering similar plans as those offered by CMIC" within their primary marketing areas. [Compl., Ex. K, p. 1]. CMIC also maintained the right of first refusal on all individual major medical business within the Plaintiffs' primary marketing areas. Finally, CMIC required the Plaintiffs to abide by Conseco's code of conduct in connection with the sale and servicing of CMIC's insurance policies. [Compl., Ex. K, pp. 2-3; Docket No. 54, Ex. A, p. 6]. Relying on these facts, a reasonable jury could conclude that the Plaintiffs were the agents of CMIC. Thus, CMIC's argument in this regard must fail. See Coca-Cola Co., 806 N.E.2d at 46 ("Whether an agency relationship exists and the scope of the agent's authority is a question of fact for the jury.").

CMIC also maintains that the Plaintiffs' breach of fiduciary duty claim fails because it is

based upon arm's length negotiations. CMIC is correct that, in Indiana, "[a] fiduciary relationship may not be premised on an arms length transaction resulting in the formation of a contract." American United Life Ins. Co. v. Douglas, 808 N.E.2d 690, 701 (Ind. Ct. App. 2004). Nonetheless, summary judgment is inappropriate on this issue. As explained by the Indiana Court of Appeals:

> Assuming no agency relationship exits, CCE points out that the parties were only involved in arms length negotiations, and the law is clear that a fiduciary relationship may not be predicated on such an arrangement. Mullen v. Cogdell, 643 N.E.2d 390, 401 (Ind. Ct. App. 1994), trans. denied (1995). However, we have held that a fiduciary relationship is not the only basis for a claim of constructive fraud. [Wells v. Stone City Bank, 691 N.E.2d 1246, 1251 (Ind. Ct. App. 1998)]. Our focus is on whether the relationship invokes a duty of good faith and fair dealing. Id. In certain relationships, one party may be in the unique possession of knowledge not possessed by the other and may thereby enjoy a position of superiority over the other; such a relationship is one that invokes a duty of good faith and fair dealing. Mullen, 643 N.E.2d at 401 (recognizing that the relationship between a buyer and a seller can create a duty).
>
> . . . .
>
> In its motion in opposition to CCE's motion for summary judgment, Babyback's pointed to evidence indicating that CCE led Babyback's to believe that CCE would agree to a national contract to prevent Babyback's from taking the co-marketing idea to CCE's competitor. See Appellants' App. p. 500. Whether this is sufficient to establish that CCE was in the unique possession of knowledge not possessed by Babyback's allowing CCE to enjoy a position of superiority over Babyback's and invoking a duty of good faith and fair dealing is a question of fact for the jury.

Coca-Cola Co., 806 N.E.2d at 48. Similarly, in the case at hand, the Plaintiffs allege that CMIC misrepresented its financial stability and led the Plaintiffs to believe that it was committed to the major medical insurance market to prevent the Plaintiffs from selling insurance offered by other providers. Accordingly, whether CMIC owed the Plaintiffs a duty of good faith and fair dealing is a question of fact. CMIC's motion for summary judgment on this claim is denied.

C.     **Tortious Interference with Prospective Business Advantage.**

Finally, CMIC seeks dismissal of Plaintiffs' tortious interference with a prospective

business advantage claim.  In order to prevail on this claim, Plaintiffs must establish: "(1) the

existence of a valid relationship; (2) the defendant's knowledge of the existence of the

relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of

justification; and (5) damages resulting from defendant's wrongful interference with the

relationship." Levee v. Beeching, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000).  In addition,

"illegal conduct is an essential element of tortious interference with a business relationship." Id.

Moreover, "such an action involves the intervention of a third party and will not lie against a

party to the contract." Keith v. Mendus, 661 N.E.2d 26, 36 (Ind. Ct. App. 1996), citing Martin v.

Platt, 386 N.E.2d 1026, 1027 (Ind. Ct. App. 1979) (holding that officers of a corporation acting

within the scope of their employment could not be held independently personally liable for

inducing the corporation's breach of its contract).

According to CMIC, Plaintiffs' tortious interference claim must be dismissed because:

"(1) Plaintiffs fail to allege any interference with prospective business advantage that Defendants

were not already a contractual party to; and (2) Plaintiffs fail to allege any illegal activities

committed by Defendants which 'interfered' with prospective business relations." [Docket No.

54, p. 11].  Plaintiffs, on the other hand, argue that "Defendants' Reply wrongly claims . . . that

Plaintiffs did not identify any relationships to which the Defendants themselves were not

parties." [Docket No. 59, p. 22].  Moreover, Plaintiffs contend that their allegations of fraud

satisfy the illegal conduct element of this claim.  For the reasons set forth below, the Court

agrees with the Plaintiffs.  While not a strong claim, given the current posture of the case and

16

CMIC's concessions regarding the Plaintiffs' alleged facts, CMIC's motion must be denied on this claim.[10]

>According to CMIC:
>
>Each party in the insurance distribution chain, however, from the local agent to the state/regional distribution head, all signed agreements with Defendants. Plaintiffs have failed to identify one affected business relationship that did not involve Defendants. Accordingly, Defendants were a party to any possible business relationship forged in their insurance distribution chain, and Plaintiffs' claim fails as a matter of law.

[Docket No. 60, pp. 9-10] (footnote omitted). At first blush, CMIC's argument makes good sense. If, in fact, CMIC contracted with each of the Plaintiffs' sub-producers as part and parcel of its relationship with the Plaintiffs, then Plaintiffs' tortious interference claim would fail for want of the intervention by a non-party to the relationship. However, CMIC failed to submit evidence supporting its claim that it had signed agreements with each of Plaintiffs' sub-producers. On the other hand, Plaintiffs submitted affidavits -- in addition to the conceded allegations found in the second amended complaint -- indicating that each Plaintiff established relationships with its own sub-producers and that CMIC damaged those relationships by making fraudulent representations and hastily exiting the major medical insurance market. [Martin, Noell, Smith, Jasnoski, Froug, Kanatzar, Vandersnick, Schwenkner Affs., ¶¶ 25-26; Reichley, Sepulveda Affs., ¶¶ 24-25]. In addition, it is possible that, even assuming CMIC had signed contracts with each of the sub-producers, the Plaintiffs had business relationships with the sub-producers outside that which included CMIC. Accordingly, viewing the facts in a light most

---

[10]In denying CMIC's motion, the Court does not suggest that a jury verdict on this issue is inevitable. CMIC relied solely on the allegations in Plaintiffs' second amended complaint in its attempt to dismiss this claim. Given the weakness of this claim, discovery could flesh out facts that would require judgment as a matter of law in favor of CMIC.

favorable to the Plaintiffs, the Court concludes that Plaintiffs have established the existence of business relationships to which CMIC was not a party.

      As noted above, in order for Plaintiffs to prevail on their tortious interference claim, CMIC must have acted illegally in its interference with Plaintiffs' business relationships.  In support of their claim, Plaintiffs argue that "[t]he Seventh Circuit has recognized that 'courts interpreting Indiana law have held that non-criminal illegal acts are sufficient' to pursue a claim for tortious interference with a business relationship."  [Docket No. 59, p. 21], quoting Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 641-42 (7th Cir. 1999).  In addition, while not specifically pled, Plaintiffs allege that CMIC's fraudulent actions amount to criminal deception under Indiana Code § 35-43-5-3(2), thus satisfying the illegal conduct element.  CMIC responds that Plaintiffs "have yet to allege the requisite 'illegal act' to support their intentional interference with a business advantage claim."  [Docket No. 60, p. 11].  Furthermore, CMIC states that "no statutory allegation of 'illegal' activities ever appeared in their pleadings," [Docket No. 60, p. 11], and that "Plaintiffs' rationale must fail because there is **no authority** for the position that the required 'illegal' act for an intentional interference with business advantage claim can be inferred from the factual allegations of a complaint when said complaint contains no statutory allegation of an 'illegal' act."  [Docket No. 60, p. 12].  The Court disagrees and finds that the Plaintiffs' allegations of fraud, if proved, could satisfy the illegal conduct element.

      Indiana case law provides little guidance on what constitutes illegal conduct for purposes of establishing a tortious interference with a business relationship claim.  For example, without elaboration, the court in Levee v. Beeching, 729 N.E.2d 215, 222-23 (Ind. Ct. App. 2000), found that "[d]espite the lack of a definition or test for a showing of the 'illegal conduct' element of

tortious interference with a business relationship, case law does not support a finding that defamation constitutes illegal conduct."  In <u>Bradley v. Hall</u>, the court likewise noted the lack of direction on this issue, stating:

> "Illegality" is not a term of art, and no court has defined the meaning of "illegal" as used in this context.  The Restatement suggests that interference with prospective business relations requires more blameworthy means be used than does interference with contractual relations.

720 N.E.2d 747, 751 n.3 (Ind. Ct. App. 1999).

Noting that "courts interpreting Indiana law have held that non-criminal illegal acts are sufficient" to establish a tortious interference with a business relationship claim, the Seventh Circuit Court of Appeals found that violation of the Federal Trademark Dilution Act could supply the requisite illegal conduct.  <u>Syndicate Sales, Inc.</u>, 192 F.3d at 641, <u>citing</u> <u>United States v. FKW Inc.</u>, 997 F. Supp. 1143, 1153 (S.D. Ind. 1998) (finding allegation of False Claims Act satisfied illegal conduct element); <u>Moffett v. Gene B. Glick Co., Inc.</u>, 604 F. Supp. 229, 239 (N.D. Ind. 1984) (court found that plaintiff "pleaded several illegal acts," including "violation of 42 U.S.C. § 1981, invasion of privacy, and infliction of emotional distress"), <u>overruled on other grounds</u>, <u>Reeder-Baker v. Lincoln Nat'l Corp.</u>, 644 F. Supp. 983 (N.D. Ind. 1986).  Relying on these decisions, courts have identified additional non-criminal acts that may satisfy the illegal conduct element.  <u>See</u> <u>e.g.</u> <u>Gaskins v. Vencor, Inc.</u>, 2001 WL 300517, at *26 (S.D. Ind. 2001) (sexual harassment, if proved, could supply requisite illegal conduct); <u>Associates Financial Services Company Inc. v. Bowman, Heintz, Boscia & Vician PC</u>, 2001 WL 619381, at *8 (S.D. Ind.) (filing lawsuit for alleged improper reasons, as well as alleged intimidation and exertion of economic duress, could amount to illegal conduct).

In short, the cases involving this issue do not provide a coherent definition or roadmap of

19

what is considered illegal action for purposes of stating a claim of tortious interference with a business relationship.  CMIC concedes that the requisite illegal act need not be criminal.  Nonetheless, CMIC seemingly maintains that, for a tortious interference with a business relationship claim to be actionable, the alleged illegal act must be violative of some statute, and that statute must be specifically plead.  CMIC did not cite -- and the Court has not found -- any cases that stand for this proposition.  Moreover, Plaintiffs are not required to plead each and every fact to support their claim.  All that is required is a "short and plain" statement notifying CMIC of the principal events.  Hoskins v. Poelstra, 320 F.3d 761, 764 (7th Cir. 2003), citing Fed. R. Civ. P. 8.  Plaintiffs' allegations of fraud satisfy that requirement.[11]   In short, absent further clarification from Indiana courts, the Court finds that a reasonable jury could find that Plaintiffs' allegations of fraud, if proved, satisfy the illegal conduct element of tortious interference with a business relationship.  Thus, CMIC's motion for summary judgment is denied on this claim.

---

[11] The Court is well aware that Fed. R. Civ. P 9(b) requires a party to plead allegations of fraud with sufficient particularity.  Plaintiffs met this threshold in paragraphs 20-84 of their 31-page amended complaint.  [Docket No. 40, pp. 5-18.]

**V.      Conclusion.**

For the reasons stated above, CMIC's motion for summary judgment with respect to

Count I of the Plaintiffs' second amended complaint (breach of contract) is GRANTED.

CMIC's motion for summary judgment on Count II (breach of fiduciary duty) and Count III

(tortious interference with prospective business advantage) is DENIED.

So ordered.  Dated:

Copies to:

Lawrence Lee Bennett Jr.
leegalaw@bellsouth.net

Paul Peter Bolus
Bruce Harvey Beerman
BURR & FORMAN LLP
pbolus@burr.com

Gary Lane Howard
BURR & FORMAN LLP
ghoward@burr.com

Offer Korin
KATZ & KORIN
okorin@katzkorin.com

Spencer J. Krupp
SPIX & KRUPP
krupp@bellsouth.net

Jamie Lee Moore
BURR & FORMAN LLP
jmoore@burr.com

David Brian O'Dell
BURR & FORMAN LLP
bodell@burr.com

Mark Van Spix
SPIX & KRUPP
spix@bellsouth.net

Scott A. Weathers
HUFFER & WEATHERS
scott_weathers@hufferandweathers.com

Sally F. Zweig
KATZ & KORIN
szweig@katzkorin.com